779 So.2d 554 (2001)
ROCKLEDGE MALL ASSOCIATES, LTD., et. al., Appellants,
v.
CUSTOM FENCES OF SOUTH BREVARD, INC., Appellee.
No. 5D99-3084.
District Court of Appeal of Florida, Fifth District.
January 19, 2001.
Rehearing Denied March 21, 2001.
*555 Stewart B. Capps, of Stewart B. Capps, P.A., Indialantic, for Appellants.
Lisa Hogreve, and Patrick F. Roche, of Frese, Nash & Hansen, P.A., Melbourne, for Appellee.
GRIFFIN, J.
Appellants, Rockledge Mall Associates, Ltd. ["Rockledge"], and Thomas Palumbo ["Palumbo"] appeal a final judgment holding both liable for tortious interference with an advantageous business relationship and ordering Appellants to pay damages of $60,000. We reverse.
The dispute between the parties to this appeal arose out of a contract entered into between Rockledge and Custom Fences, pursuant to which Custom Fences was to erect and install 134 chain linked, galvanized flea market booths for a Rockledge project ["Swap Shop" job]. Palumbo was the President of Rockledge Mall, a limited partnership.[1] John Daly ["Daly"] was the owner and President of Custom Fences.
Rockledge Mall sued Custom Fences and Custom Fences filed a counterclaim, Count III of which was a claim against Rockledge and against Palumbo, individually, for tortious interference with a business relationship that Custom Fences had with a material supplier, Stevens Pipe & Steel ["Stevens Pipe"]. Custom Fences had engaged a company called Industrial Fence to fabricate chain link panels that were being incorporated into the Rockledge job and had also placed an order with Stevens Pipe to fabricate the final fifty panels. Custom Fences had an ongoing relationship with Stevens Pipe as a supplier. Daly testified that Stevens Pipe sold materials to Custom Fences at between twenty-five to fifty percent lower than other suppliers. He also testified that, after the first six months of doing business with Custom Fences, Stevens Pipe extended Custom Fences credit of either twenty-five or thirty-five hundred dollars. It was also convenient for Custom Fences to use Stevens Pipe because of its location.
The facts leading up to the tortious interference claim are as follows. Daly testified that he advised Palumbo that he was picking up the fifty panels from Stevens Pipe on Saturday, November 23, and that he had two workers lined up to install them that weekend. According to Daly, Palumbo told him to "forget about" the panels and concentrate his efforts instead on installing handicap handrails because Rockledge could not get its certificate of occupancy without them. The parties entered into a handrail contract on the spot totaling $3,080 which Palumbo paid by check. Daly asked Palumbo for the $5,000 needed to pay Stevens Pipe for the panels but Palumbo did not give him the money. Daly told David Mann, the manager of Stevens Pipe, that he did not have the money to pay for the panels but asked Mann to hold the panels for him.
A welder recommended by the general contractor was to begin work the following Monday on the handrails. Daly purchased the materials for the handrail job on Monday morning from Stevens Pipe and met with the welder. The welder left the job promising to return with additional tools, but never came back. Palumbo then terminated Custom Fences and put a stop payment on the check for the handrail job. Palumbo contracted with Industrial Fence to complete the handrail job.
Mann testified that, after Custom Fences' termination from the Rockledge job, someone contacted Stevens Pipe on behalf of Rockledge to buy the fifty panels. Mann testified:

*556 Question: Do you recall receiving a telephone call from Elizabeth Palumbo or an owner of the Swap Shop?
Answer: I spoke with an individual I assumed was the owner of the Swap Shop, yes. I don't remember the name.
Question: Did he identify himself with you as the owner of the Swap Shop?
Answer: I believe he did, or a representative... I can't remember which.
The individual who called Mann informed him that Daly was not performing his obligations and that the caller wanted to purchase the panels to complete the project. Mann informed the caller that he was a wholesaler to fence companies and he would not sell to anyone who was not a fence dealer. Mann testified that the person requesting to purchase the panels may have indicated that he would send a contractor to pick up the panels because a contractor eventually showed up. The contractor that picked up the panels was Industrial Fence.
Shirley Tindall, owner of Industrial Fence, testified that she was aware that she and Stevens Pipe were both fabricating panels for Daly during the same time period[2] and that her company did use fabricated panels from Stevens Pipe to complete the contract. Tindall testified that she had panels fabricated for herself from Stevens Pipe, and there were also panels that had been fabricated for Custom Fences that she took. She said Palumbo had no discussion with her as to where Tindall should get the panels to complete the job.
Appellee's theory of tortious interference with an advantageous business relationship was that the breach in the relationship between Custom Fences and Stevens Pipe occurred because Stevens Pipe felt guilty that it had acted unethically in selling the panels to Industrial Fence, and, consequently, couldn't "face" Daly, much less continue to supply him. Because Stevens Pipe was Custom's best supplier, it was "devastating" to lose them because to bid competitively on a job would result in a reduced profit margin. There is no evidence that Daly attempted to order materials from Stevens Pipe but was turned down. Nor does Daly explain why he could no longer place orders with Stevens Pipe or how he knew that Stevens Pipe would not supply him.
Mann, of Stevens Pipe, offered evidence that did not support Daly's theory in many respects. Mann testified that Custom Fences had been given credit; however, after three checks from Custom Fences were returned for insufficient funds during the months of July and August 1996, Stevens Pipe had put Custom Fences on a C.O.D. arrangement. Stevens Pipe did continue to do business with Custom Fences because some of the checks were made good; however there was an unpaid balance that Stevens Pipe had to write off in December 1997.
Mann recalls that Stevens Pipe had accommodated Daly and fabricated the fifty panels quickly. Mann said that it was part of his normal business practice to accommodate customers and Stevens Pipe would have done it for any customer. Mann maintains that a standard discount would be given to Daly based on the quantity he ordered. When asked why no more orders were placed by Custom Fences with Stevens Pipe after November 1996, he responded:
I don't recall exactly why, but the panels that we had fabricated for him apparently were not correct, but yet we built them according to the information that he provided to us and he did not want *557 the panels, said they were not going to work the way they were.
Mann recalled Daly telling him to hold the panels, however, Mann wished to get rid of them, as they were specially made and of no value to Mann. Mann was not aware that Daly was upset when he learned of the sale of the panels to Industrial Fence.
Appellants correctly contend on appeal that the trial court erred in denying their motion for directed verdict on the claim of tortious interference with a business relationship. Although this claim suffers from multiple factual and legal infirmities, the trial court would not even entertain argument on appellant's motion.
The necessary elements of the tort of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812 (Fla.1994). In this case, the first element is not in issue and there is some slight evidence that Rockledge knew that Stevens was the supplier of the fifty panels. This claim fails mainly on elements (3) and (4).
The existence of malice is key to the tort of tortious interference with a business relationship. In Southern Bell Tel. and Tel. Co. v. Roper, 482 So.2d 538 (Fla. 3d DCA 1986), the Third District observed that:
Absence of malice [is] a primary issue. The only way that malice can be proven in the absence of direct evidence is by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.
Id.
Though a showing of malice or ill will is necessary, there is no requirement that the interference was intended to secure a business advantage over the plaintiff. Tamiami Trial Tours, Inc. v. Cotton, 463 So.2d 1126 (Fla.1985). The supreme court concluded there is "no logical reason why one who damages another in his business relationships should escape liability because his motive is malice rather than greed." Tamiami, 463 So.2d at 1128. The interference however must be both direct and intentional. Lawler v. Eugene Wuesthoff Memorial Hosp. Ass'n, 497 So.2d 1261, 1263 (Fla. 5th DCA 1986). Viewing the evidence presented at trial, there was no evidence that Rockledge intended any interference in Custom Fence's advantageous relationship with Stevens Pipe. Rockledge sought to obtain the custom panels, which had been ordered for their project, after Custom Fences had been fired from the job. The owner's effort to obtain these panels under these circumstances negates the malice required for this very limited tort.
There is also the problem of causation. Custom Fences might conceivably have had a claim for tortious interference with the contract between Custom Fences and Stevens Pipe for the panels because the panels would at least have provided leverage in Daly's negotiations with Palumbo, but this tort was not pleaded, perhaps because the damages were subsumed in the breach of contract claim. Here, the claim is that the purchase of the panels by Rockledge's replacement subcontractor caused Stevens Pipe to cease doing business with Custom Fence. Even if this were foreseeable, and we think it is not, there is nothing in the record to support it other than Daly's supposition.
Finally, apart from the foregoing, it was error to hold Palumbo, as President of Rockledge, individually liable for tortious interference with the relationship between *558 Custom Fences and Stevens Pipe based on the purported contact by Palumbo with Stevens Pipe to purchase the custom panels, because the claim was not supported by any evidence. No evidence was offered that Palumbo was in fact the person who made the telephone call to Stevens Pipe. Custom Fences relies on "circumstantial evidence" that the call was made by Palumbo, but there were other principals or representatives of Rockledge that could have made the call. Additionally, Mann refused to sell the panels to Rockledge; it was Industrial Fence that purchased the panels.
For the foregoing reasons, we reverse the appealed judgment and remand with directions to enter judgment for Rockledge and Palumbo on the tortious interference claim.
REVERSED and REMANDED.
ORFINGER, M., Senior Judge, concurs.
PLEUS, J., concurs specially, with opinion.
PLEUS, J., concurring specially.
I concur in the result of the majority opinion with one reservation. The appellant's motion for directed verdict on the claim of tortious interference with a business relationship should have been granted only for lack of any evidence of damage to Custom Fences as a result of the breach. As I read the record on appeal, there was some evidence, weak as it was, to satisfy the third element of intentional and unjustified interference.
NOTES
[1] Anthony Pugliese was Palumbo's partner.
[2] Tindall further testified that Daly advised her that he was behind on his deadline for the Rockledge job because Custom Fences was working on a county job and under a penalty clause. Daly maintains that he was behind on the job due to Palumbo's nonpayment or late payments.